UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CR No. 20-53JJM |
| : | |
| LUIS SALGADO : | |

**MEMORANDUM AND ORDER
REGARDING DETENTION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Pending before the Court is the government's motion for detention of Defendant Luis Salgado, a citizen of Mexico, who is charged with illegally reentering the United States, after he was removed in 2019, in violation of 8 U.S.C. § 1326(a), (b)(2). The motion was made at Salgado's initial appearance on July 17, 2020; the detention hearing was continued at Salgado's request to July 23, 2020. During the second hearing, the Court questioned whether the detention decision may be informed by the likelihood of Salgado's nonvolitional nonappearance due to the detainer of the Immigration and Customs Enforcement Division of the Department of Homeland Security ("ICE"), as well as whether and how dangerousness may be considered, and asked the parties to file briefs presenting legal argument and any additional factual information bearing on these issues. Once this briefing (which clearly established that an ICE detainer does not require detention) was completed, to allow better focus on whether there are conditions that would reasonably assure Salgado's appearance and the safety of other persons and the community, the Court asked Pretrial Services to further investigate Salgado's history and characteristics, particularly his criminal history.

With Pretrial Services' amended report having been provided to the parties, the matter is now ripe for decision.

## I.  BACKGROUND

Now 28 years old, Salgado was born in Mexico and brought to the United States at the age of three.  He lived in New York until he was 13 and in Rhode Island since; his parents and two siblings live in the United States.  As Salgado told ICE in 2013, Mexico is a place he knows nothing about and he fears due to the violence of the drug cartels.  ECF No. 15-1 at 11.  He has limited education, ending in the eighth grade, and claims that he began working when he was twelve, employed at low hourly rate jobs.  For the past six years, he worked for the same employer until he was laid off due to the pandemic.  The government represents that, because of his immigration status, Salgado cannot legally work in the United States.  ECF No. 15 at 2.  For seven years, Salgado has been married to a United States citizen.  They now have three young children, all United States citizens.  Except for the brief period following his 2019 removal, Salgado has lived with his wife and three children in Rhode Island.  Since the age of 13, Salgado has been a daily user of marijuana; he was also an occasional user of cocaine until approximately two years ago.

Salgado has an extensive juvenile criminal history[1] beginning in 2004 at 13.  In 2006 and 2007 (ages 14 and 15), he was repeatedly found wayward, resulting in several sentences at the Rhode Island Training School.  In 2008, Salgado (age 16) was arrested in New York and adjudicated for criminal possession of stolen property and petit larceny.  In 2009, the New York

---

[1] The substance of Salgado's juvenile criminal history is not placed on the scale because crimes committed by a child are of little weight.  United States v. Owens, No. CR SAG-20-0056, 2020 WL 3447764, at *4 (D. Md. June 24, 2020) (the court "did not consider the substantive nature of [the defendant's] juvenile adjudications for the purposes of assessing the danger").  The juvenile criminal history is pertinent only as a counter to Salgado's claim that he was working after his education ended, as well as because an adjudication in Salgado's late teens led to a probation violation and a warrant after he became an adult.

court placed him on probation for three-years; in 2012 (after Salgado became an adult), he was violated and a warrant issued, which remains outstanding.

Salgado's adult criminal history began in Rhode Island in 2010, when he was just 18, with felony charges of breaking and entering. He was initially released with a no contact order, but five months later was held for a month without bail as a violator; he was released, again with another no contact order. The charges were dismissed some five months later. Salgado's next felony charge was possession with intent to distribute controlled substances for which he was arrested on October 28, 2010, while on probation in New York and while the breaking and entering case was pending. He was nineteen. After he was released on bail, this charge remained pending until February 6, 2014, when Salgado pled *nolo contendere* and was sentenced to three years of probation. In 2017, this sentence was amended and Salgado was found to be in violation of the suspended sentence. Two warrants were issued in this case, apparently based on failures to appear.

While the 2010 drug trafficking charges were pending in Rhode Island, in 2011, Salgado was arrested in New York for possession of cocaine. A 2012 warrant for failure to appear remains outstanding. Also in 2012, the New Rochelle (New York) police issued a warrant for "Harassment 2nd Degree: Physical Contact." That warrant remains active.

On March 28, 2013, with the 2010 trafficking charge still pending and two active New York warrants, Salgado was found by Rhode Island law enforcement in the presence of a group of MS-13 gang members; he was arrested in Cranston, Rhode Island in connection with a federal/state investigation of heroin trafficking by the MS-13 gang.[2]  ECF No. 15-1 at 3-6, 8.

---

[2] For background on the circumstances of Salgado's arrest, the government has provided a December 5, 2013, press release. ECF No. 15-1 at 3; see United States v. Acevedo-Ramos, 755 F.2d 203, 208 (1st Cir. 1985) (permitting admission of hearsay evidence at detention hearing so long as it is still "strong and reliable"). The release states that twenty-four arrestees were charged with crimes, while twelve were not charged but were transferred to the custody

3

Salgado was held at the ACI until April 16, 2013, and then was transferred into ICE custody. ECF No. 15-1 at 8. ICE records indicate that Salgado "is a Verified Member of the International Criminal Organization Mara Salvatrucha also known . . . as MS-13." ECF No. 15-1 at 10. Salgado's ACI record identifies him as a member of the "Surenos Sur-13 [MS-13 Affiliate]."[3] ECF No. 15-1 at 10. During his 2013 ICE interview, Salgado told ICE that he considers himself to be a Sureno gang member "by association and affiliation." ECF No. 15-1 at 10. Undated photographs of Salgado proffered by the government depict what are characterized as tattoos showing membership in and allegiance to the Sur-13 gang, ECF No. 15-1 at 2, verified by an ICE record from April 2013 that includes a description of Salgado's Sur-13 gang-affiliated tattoos. ECF No. 15-1 at 11. Importantly, while this evidence of gang membership is very strong, there was no evidence proffered that links Salgado to gang violence.

According to the ICE "Record of Deportable/Inadmissible Alien," Salgado was detained by ICE as of April 16, 2013, pending removal proceedings. He was subsequently released on bond, but was arrested in 2017 for a violation and his bond was revoked. He was released again, but in July 2019, taken back into ICE custody after he was released from the ACI (following the arrest for domestic violence discussed below); he was again found to have violated his bond, which was revoked a second time. During 2019 interviews with an immigration officer, Salgado admitted that he is a member of the Sur-13 gang. ECF No. 15-1 at 2. Pursuant to the order of an

---

of ICE for deportation proceedings. Salgado is listed in the latter group; he was charged only with obstruction of the police, which charge was quickly dropped. See generally ECF No. 15-1 at 3-6.

[3] For background on the Sur-13 gang, the government relies on a Wikipedia article, which describes the "Surenos" or "Sur 13" as groups of loosely affiliated gangs that pay tribute to the Mexican Mafia; it is found throughout the United States and in parts of Mexico and maintains relationships with various drug trafficking organizations based in Mexico. ECF No. 15-1 at 12. This submission is afforded limited weight.

immigration court, Salgado was removed from the United States to Mexico on November 19, 2019.  ECF No. 1-2 at ¶ 5.

After he was initially released on bond in connection with the removal proceeding that was initiated in 2013, Salgado's Rhode Island criminal history continued, with new misdemeanor convictions and a new felony charge, as well as a very troubling series of allegations of domestic abuse and violence directed against his wife.  From 2014 to 2017, Salgado pled *nolo contendere* four times to the misdemeanor of driving without a license, resulting in the issuance of seven warrants for late payment of court-ordered restitution.  On November 3, 2018, Salgado was arrested for possession of a controlled substance; this felony charge resulted in the issuance of a warrant that was cancelled although the charge remains pending.  The first suggestion of domestic violence is in February 2017, when Salgado's wife initiated the first of two abuse complaints in the Rhode Island Family Court; after a temporary protection order entered, the 2017 case was dismissed.  In March 2019, she again filed an abuse complaint in Family Court; again, it was dismissed after entry of a temporary protection order.  Later in 2019 (on July 7, 2019), Salgado was arrested and criminally charged with domestic violence directed at his wife; the circumstances recorded in the police report regarding this incident are very troubling, including that officers observed physical injuries and that Mrs. Salgado told them that this was not the first assault by Salgado, as well as that Salgado had threatened her if the incident caused him to lose access to the children.  This charge quickly resulted in a no contact order and, at some point, a warrant for failing to appear, but was dismissed a year later.  Two days after the domestic violence arrest, on July 9, 2019, Salgado was released from the ACI and transferred into ICE custody, leading to his removal from the United States on November 19, 2019. ECF No. 1-2 at ¶ 5.

Salgado apparently quickly returned to the United States without legal authorization to do so. On June 3, 2020, he was arrested in Rhode Island and charged with felony assault. The circumstances of this charge remain unknown. He posted bond on July 9, 2020, and was transferred into ICE custody the same day. ECF No. 1-2 ¶ 3. During booking, he admitted that he is a citizen of Mexico. Id. at ¶ 4. After his fingerprints confirmed that he had been removed from the United State to Mexico less than seven months before, a criminal complaint charging him with illegal reentry issued on July 15, 2020. See ECF No. 1. He was promptly transferred to the custody of the United States Marshals Service to face the criminal charge. As represented by the government at the hearing, he was twenty-four hours from deportation when the criminal charges were brought. Salgado was indicted for illegal reentry on July 22, 2020. ECF No. 9.

## II.    APPLICABLE LAW

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987). Pursuant to the Bail Reform Act, a Court may conduct a detention hearing only under the circumstance specified in 18 U.S.C. § 3142(f), and it is well settled that where "detention is based on dangerousness grounds, it can be ordered only in cases involving one of the circumstances set forth in § 3142(f)(1)." United States v. Ploof, 851 F.2d 7, 11 (1st Cir. 1988); see United States v. Suastegui, No. 3:18-mj-00018, 2018 WL 3715765, at *1 (W.D. Va. Aug. 3, 2018). Otherwise, a detention hearing may be held only based on the grounds specified in § 3142(f)(2): "(A) a serious risk that the person will flee; or (B) a serious risk that the person will obstruct . . . justice . . . or intimidate . . . a prospective witness or juror." 18 U.S.C. § 3142(f)(2). It is § 3142(f)(2)(A) (flight) that is in issue in this case; there is no suggestion of obstruction or witness/juror intimidation.

If the Court is satisfied that the government has sustained its burden under § 3142(f)(2)(A) of establishing serous risk of flight by a preponderance of the evidence, United States v. Patriarca, 948 F.2d 789, 793 (1st Cir. 1991), the detention hearing may proceed, with the analysis focused on whether there are conditions that "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e); United States v. Villatoro-Ventura, 330 F. Supp. 3d 1118, 1125 (N.D. Iowa 2018). This analysis is informed by the factors listed in § 3142(g): (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the defendant's history and characteristics; and (4) "the nature and seriousness of the danger to any person or the community" that would be posed by the defendant's release. See United States v. Aleman-Duarte, No. 3:19-CR-149-PLR-DCP, 2020 WL 236870, at *5 (E.D. Tenn. Jan. 15, 2020) (internal quotation marks omitted). If the Court's § 3142(e) determination is based on the finding (in consideration of the § 3142(g)(4) factor) that no conditions will reasonably address the danger posed by release, the facts supporting that finding must amount to clear and convincing evidence. 18 U.S.C. § 3142(f).

When addressing a § 3142(f)(2)(A) motion for detention based on risk of flight, the Court's initial determination whether to conduct a detention hearing at all may not be based on findings of dangerousness. If a serious risk of flight is not established, "[d]anger to the community present in the likelihood defendant would continue to commit offenses . . . could be considered only in setting conditions of release." Ploof, 851 F.2d at 11. "Congress did not intend to authorize preventive detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists." Id. However, "once there is a basis to hold a detention hearing," the court is required to consider if any conditions of release would reasonably assure the safety of the community and the appearance of the defendant pursuant to

18 U.S.C. § 3142(g).  United States v. Castellanos-Almendares, No. 19-CR-80144, 2019 WL 3937862, at *2-3 (S.D. Fla. Aug. 20, 2019).  That is, "[i]f the Court, at a detention hearing properly sought by the Government under the Bail Reform Act on serious risk of flight grounds, determines that, based on the facts, proffer, testimony, and argument presented, the release of the defendant would constitute a danger to the community or a person in the community, the Court cannot simply turn a blind eye to those facts."  Id. at *3.

The parties agree that neither "serious risk" of flight pursuant to § 3142(f)(2)(A) nor risk of nonappearance pursuant to § 3142(e) can be established *per se* by the existence of an ICE detainer, even though the practical consequence of such a detainer may be a nonvolitional failure to appear.  A court "may consider the presence of an ICE detainer but that it is only one factor in the analysis.  It is not dispositive.  It neither mandates release nor compels detention."  Aleman-Duarte, 2020 WL 236870, at *4 (internal quotation marks omitted).  A *per se* rule mandating pretrial detention in the presence of an ICE detainer would raise serious constitutional concerns.  See generally United States v. Villatoro-Ventura, 330 F. Supp. 3d at 1134 n.18.  Rather, "'failure to appear' as used in the Bail Reform Act is limited to the risk that the defendant may flee or abscond, that is, that he would fail to appear by virtue of his own volition, actions and will."  United States v. Trujillo-Alvarez, 900 F. Supp. 2d 1167, 1176 (D. Or. 2012) (internal quotation marks omitted).  "Alienage may be taken into account, but it is not dispositive."  United States v. Santos-Flores, 794 F.3d 1088, 1090 (9th Cir. 2015).

### III.  ANALYSIS

#### A.  18 U.S.C. § 3142(f)(2)(A) Detention Hearing

In this case, none of the § 3142(f)(1) circumstances obtain, yet the government (incorrectly) asked for a detention hearing based on danger, as well as risk of flight.  Defendant

contends, and I agree, that the government's motion must be grounded in § 3142(f)(2)(A), which requires that it must demonstrate "a serious risk that the person will flee" before the Court can consider detention. Thus, the gateway issue for the Court is whether the government has sustained its burden under § 3142(f)(2)(A) of establishing that there is a serious risk that Salgado will flee. If it has not, the Court may not proceed with a detention hearing and must instead focus on the setting of conditions pursuant to 18 U.S.C. § 3142(c). Salgado argues that the risk of flight is very small and not "serious" because it is based only on a handful of warrants for failing to appear and the risk of removal to Mexico. ECF No. 16 at 3-4. Offsetting that risk are Salgado's strong and deep family ties in Rhode Island, including his relationship with his wife of seven years,[4] his three young children (one of whom has a potentially serious medical condition) and siblings. Id. There is no question that Salgado's family ties in Rhode Island, particularly to his children, are strong and long-standing, while his ties in Mexico are nonexistent.[5] I nevertheless find that the evidence establishes by a preponderance that there is a "serious risk" that, if released, Salgado will decide to flee and fail to appear.

The analysis begins with the evidence establishing that, if Salgado remains and appears, he likely faces not just a short (relatively) period of incarceration, but also what to him is a far more serious consequence– permanent separation from his family by removal to Mexico, a country in which he will be a stranger and where he fears the violence of the drug cartels.[6]

---

[4] At this point in the analysis, the three allegations of domestic abuse/violence by Salgado's wife are not considered; with no adjudication of any of them, I treat that evidence as pertinent only to whether a condition requiring him to remain in the home with her is appropriate, as discussed infra.

[5] Unlike his family ties, Salgado's work history has no mitigating impact on the seriousness of the risk of flight. It amounts, at most, to hourly-rate work in the past few years at or close to minimum wage. See also n.1 supra. Further, Salgado's immigration status bars him from legally working.

[6] This finding is not the Court's prediction of what will happen – rather, the Court's finding is focused on what is realistic for Salgado to expect, which is what informs his decision to stay or flee. Also bearing on Salgado's perceived risk of deportation is the reality that, whatever defenses to he may have had to deportation were ultimately

Together, these create a powerful motivation to flee. The government has further established Salgado's longstanding and admitted ties to the Sur-13 gang, which has tentacles throughout the United States. This evidence permits the inference that Salgado would be able to disappear should he decide to do so.

As to the risk that he will fail to comply with court-ordered conditions set to reasonably assure that he will not flee, Salgado's adult criminal history tells an unfortunate and compelling story that the risk of flight is extremely serious. For starters, there are four Rhode Island warrants for failing to appear, two of them quite recent (2018/2019), as well as three open warrants in New York. And while Salgado argues correctly that the seven other warrants (for failing to make timely court-ordered payment of restitution) do not have as much weight as a warrant for failing to appear, they remain as further troubling evidence of a disregard for court orders mandating timely actions to be taken. Added to these are the many findings that Salgado violated judicially-set conditions –in 2010, in 2012, twice in 2017 and once in 2019. Two of the violations were of conditions set by an immigration court while the ICE removal proceedings were pending; the second resulted in the revocation of bail until deportation was implemented.

Important to this analysis is the length and breadth of Salgado's adult criminal history – while there are only one felony and four misdemeanor convictions, as pertinent to serious risk of flight, this history demonstrates a persistent pattern of new criminal conduct committed while pretrial or probation conditions were pending, reinforcing the conclusion that Salgado has no respect for court-ordered constraints. See United States v. Acevedo-Ramos, 755 F.2d 203, 209 (1st Cir. 1985) (court may consider prior arrest as part of criminal history even though the

---

unsuccessful in the removal proceeding that was pending from 2013 until 2019, and now Salgado's legal problems are compounded by the strength of the evidence of illegal reentry.

10

defendant was not convicted of the charge). For example, in 2010, Salgado engaged in admitted drug trafficking while released for breaking and entering in Rhode Island and on probation for larceny and possession of stolen property in New York; in 2011, Salgado was arrested in New York for possession of cocaine while still on probation in New York and with the Rhode Island drug trafficking charges pending; while on probation for drug trafficking and released by ICE on bond, beginning in 2014, he committed (repeatedly) the misdemeanor of driving without a license; and in 2019, he engaged in domestic violence resulting in a no-contact order while subject to the ICE bond conditions and while the 2018 drug possession charge was pending.

Also pertinent to the serious risk of flight is Salgado's return to the United States so quickly after his 2019 removal, in defiance of the order of the immigration court. Aleman-Duarte, 2020 WL 236870, at *4 ("[d]efendant's return to this country, despite his prior removal, indicates a disregard for the immigration court's removal order and suggests that he would not abide by the requirement that he appear for proceedings in this Court"). Exacerbating this fact is his immediately picking up a new charge for felony assault – while that case is pending (so the presumption of innocence applies), it is further evidence establishing that there is a serious risk that Salgado will not comply with court-ordered requirements to appear, particularly in light of his powerful motivation and capacity to flee. Acevedo-Ramos, 755 F.2d at 209.

Taken together, I find that this evidence is more than sufficient to establish by a preponderance "a serious risk that [the] person will flee." 18 U.S.C. § 3142(f)(2)(A). Therefore, the Court must conduct a detention hearing pursuant to § 3142(e) to assess whether conditions can be set to reasonably assure Salgado's "appearance" and the "safety of any other person and the community." This determination is made by "tak[ing] into account the available information concerning" the § 3142(g) factors. 18 U.S.C. § 3142(g).

### B.        18 U.S.C. § 3142(g) Factors

The first of the § 3142(g) factors is the nature and circumstances of the offense (illegal reentry).  Id. at § 3142(g)(1).  Standing alone, this factor tips towards release because the charged offense involves no violence, does not call for a lengthy sentence and does not carry any presumption of detention.  By contrast, the second factor – the weight of the evidence – tips against release in that the evidence of Salgado's prior removal to Mexico and unauthorized reappearance in Rhode Island less than seven months later is extremely strong.  See § 3142(g)(2); see generally Aleman-Duarte, 2020 WL 236870, at *5 (evidence is "overwhelming" when defendant was deported and is found in this country again).

The third factor, 18 U.S.C. § 3142(g)(3),[7] examines Salgado's history and characteristics.  It is true that he has lived almost his entire life in the United States, mostly in Rhode, where he has a wife, three small children and two siblings.  Such length of residence and strong ties would weigh strongly in favor of release on conditions if there were a realistic expectation that remaining and appearing to face the charges would allow him to remain long-term with his family.  The problem here is that, considering the strength of the evidence, the realistic expectation is that Salgado will be convicted of illegal reentry, sentenced to a jail term and then deported to Mexico.  Aleman-Duarte, 2020 WL 236870, at *5 (inevitability of removal from the country provides motive for defendant to flee prosecution).  Otherwise, Salgado's history and

---

[7] Section 3142(g)(3) requires the Court to consider:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

18 U.S.C. § 3142(g)(3).

characteristics tip toward detention – his prior work was all low level hourly-rate employment that is not a significant anchor and, if he abides by the Court's conditions while released, he cannot work; he has no resources that he would be reluctant to abandon should he abscond; and he has a life-long habit of daily marijuana use and longstanding occasional cocaine use. Even more negative is the lengthy criminal history, which permeates the arc of Salgado's adult life and includes convictions for felony drug trafficking and four misdemeanors, fourteen warrants (seven for failing to appear), four violations of conditions, the charges of drug possession and domestic violence, both of which were pending (with release conditions) at the time that he reentered the United States following the November 19, 2019, removal, and the newest state charge of felony assault, for which he was arrested shortly after his unauthorized return from Mexico. Finally, while there is no evidence linking Salgado to gang violence, Salgado's admission of longstanding Sur-13 gang membership is a community tie with negative connotations, particularly the facilitation of flight.

The last § 3142(g) factor is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Dominating this leg of the analysis is Salgado's criminal history, which leans against release in that it establishes that, over the course of his adult life, Salgado has consistently ignored court-ordered release conditions by engaging in conduct that has led to new charges and sometimes new convictions, as well as that there is some troublingly violent conduct, particularly the 2019 charge of domestic violence (resulting in a no contact order but no conviction) and the 2020 charge for felony assault (still pending). Nevertheless, since Salgado became an adult, so far only one charge has resulted in a felony conviction and, for that, Salgado was sentenced leniently to probation; however, the crime was drug trafficking, which is considered to be *per se*

dangerous.  See United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985) ("harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'").  As to Salgado's admission of long-standing gang membership, with no evidence linking him to gang fratricide or violence, the Court affords it limited weight in assessing danger.  See United States v. Boatwright, No. 2:19-CR-00301-GMN-DJA, 2020 WL 1639855, at *5 (D. Nev. Apr. 2, 2020) (detention appropriate where criminal history dates back to age of fourteen, includes three felonies and arrests while on probation, and defendant is "a documented gang member," with no financial or property ties to community); United States v. Oliveira, 238 F. Supp. 3d 165, 167-68 (D. Mass. 2017) (criminal history and ongoing gang relationship establish that electronic monitoring "cannot be expected to prevent a defendant from committing crimes or deter him from participating in felonious activity"); United States v. Barnett, No. 5:03-CR-243(NAM), 2003 WL 22143710, at *13 (N.D.N.Y. Sept. 17, 2003) (gang membership coupled with recidivist criminal record supports conclusion that no conditions are sufficient to reasonably assure community safety); but see United States v. Anderson, No. 5:15-MJ-116, 2015 WL 13307592, at *2 (N.D. Tex. Dec. 9, 2015) (with no evidence of violent conduct, strong family ties and gainful employment, release ordered despite gang membership).

      Weighing this § 3142(g) evidence, I find that there are no conditions or combination of conditions that will reasonably assure that Salgado will appear.  Even the Court's most powerful condition – home incarceration with GPS monitoring – is effective only with a defendant committed to remaining and appearing.  Otherwise, GPS is effective only in limiting a defendant's head start; it cannot assure that he will not flee.  The harsh reality for Salgado is that compliance with the requirement to remain and appear is overwhelmingly likely to mean permanent separation from his family.  That, coupled with the substantial evidence of Salgado's

utter disregard for court-ordered conditions and requirements to appear, is more than sufficient to establish that only detention is enough to reasonably assure Salgado's appearance.

Because my conclusion regarding flight makes it unnecessary to assess whether danger independently compels an order of detention, I consider only briefly the safety prong of § 3142(e). Despite five no-contact orders and a pattern of new criminal conduct while on probation or pretrial conditions of release, with only one felony conviction and no evidence that gang membership led to gang violence, and in light of the government's higher burden (clear and convincing evidence), a finding that no conditions can reasonably assure safety appears to be a stretch, except as to one point. If the Court were wobbling (which I am not) regarding whether electronic monitoring with a curfew, home detention or home incarceration could reasonably address the risk of flight, the Court would have to place on the scale the extremely troubling pattern of domestic abuse and violence directed towards Salgado's wife who would have to support those conditions. This pattern reflects that, three times, she asserted that Salgado had abused her, the third time supported by a police report describing her injuries and statements about the abuse and his threats. Yet, three times the charges were dropped. With no adjudication of any of these charges, I make no finding regarding the truth of the victim's statements. However, based on these unproven allegations, I find by clear and convincing evidence that the Court may not use any condition that anchors Salgado to a residence occupied by a person who has three times accused him of abusing her, whether or not the accusations are true, because such a condition could not reasonably assure the safety of other persons and the community.

### IV.   CONCLUSION

      The government's motion for detention based on 18 U.S.C. § 3142(f)(2)(A) is granted.

An amended order of detention will enter forthwith.

So ordered.

/s/ Patricia A. Sullivan  
PATRICIA A. SULLIVAN  
United States Magistrate Judge  
August 17, 2020